# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KEVIN V. McGEE,  )  CASE NO. 5:11-CV-2751
  )
  PLAINTIFF,  )  JUDGE SARA LIOI
  )
vs.  )
  )
THOMAS L. ARMSTRONG, et al.,  )  **MEMORANDUM OPINION**
  )
  )
  DEFENDANTS.  )
  )

Before the Court is the motion for summary judgment filed by defendants Thomas Armstrong ("Armstrong"),[1] Lisa Kamlowsky ("Kamlowsky"),[2] and Summit County Board of Developmental Disabilities ("BDD") (collectively, "the Board"). (Doc. No. 163 ["MSJ"].) Plaintiff Kevin McGee ("McGee") filed his opposition (Doc. No. 165 ["Opp'n"]), and the Board filed a reply (Doc. No. 167 ["Reply"]).[3] For the reasons set forth herein, the motion is granted.

---

[1] Armstrong was, at all relevant times, the Superintendent of the Summit County Board of Developmental Disabilities. (Doc. No. 163-1 ["Armstrong Aff."] ¶ 1.)

[2] Kamlowsky was, at all relevant times, the Assistant Superintendent of the Summit County Board of Developmental Disabilities. (Doc. No. 163-2 ["Kamlowsky Aff."] ¶ 1.)

[3] In its reply brief, the Board asks this Court to impose sanctions under LR 7.1(i), arguing that "McGee's [r]esponse is frivolous and asserted in bad faith." (*See* Reply at 2381 (All page number references herein are to the page identification number generated by the Court's electronic docketing system.).) McGee filed a separate response to that request. (Doc. No. 168.) Although McGee's opposition to the summary judgment motion follows his case-long pattern of making unsupported, conclusory arguments –a pattern that is not helpful to any analysis –the Court declines to impose sanctions. *See, e.g., Jarmoszuk v. Farm Credit of Fla.*, No. 1:13CV0475, 2013 WL 12131309 (N.D. Ohio July 31, 2013) (discussing various cases and theories for imposing sanctions). While McGee's position may have been misguided, and although it is a close call, in the end the Court does not conclude that the opposition was necessarily frivolous or in bad faith. Therefore, to the extent the Reply includes a motion for sanctions, that motion is denied.

# I. PROCEDURAL BACKGROUND

This case arose out of the termination of plaintiff's employment by the Board. Because plaintiff served in the Ohio Army National Guard and was, upon occasion, called to active duty during his employment,[4] his complaint, as amended, alleged not only wrongful termination of employment and various breaches of the employment contract, but also discrimination and retaliation based upon his military status and service. (*See* Doc. No. 57, Second Amended Complaint ["SAC"].)[5]

On July 3, 2014, the Court granted the Board's motion to compel arbitration, isolating only two of the fourteen claims in the SAC that were not subject to contractual arbitration[6] (*i.e.*, the sixth cause of action alleging a breach of contract for failure to pay required salary and required military leave pay, and the portion of the twelfth cause of action alleging the same). (*See* Doc. No. 151, Memorandum Opinion and Order ["MOO"] at 2023.)

On August 15, 2017, on plaintiff's motion following completion of arbitration, the Court reopened the case and set a schedule for proceeding to summary judgment. The Board's motion for summary judgment is now at issue.

---

[4] Plaintiff was also called to active duty during the course of these proceedings. (*See* Doc. Nos. 10 and 148.)

[5] As the Court took the MSJ under advisement, it noticed for the first time that the defendants never filed an answer to the SAC. They had filed a motion to dismiss (*see* Doc. No. 82), which was denied without prejudice when the case was ordered to arbitration. Following arbitration, the parties proceeded to summary judgment on the remaining claims and apparently no one noticed the missing answer. By order dated May 4, 2018, the Court directed defendants to file their answer so as to have a complete record with respect to pleadings. (*See* Doc. No. 174.) Defendants did so on May 7, 2018. (*See* Doc. No. 176, Answer to SAC.)

[6] The relevant contract provided that "[a]ny dispute, claim or cause of action arising out of [the employee's] removal, suspension or demotion shall be submitted to binding arbitration . . . ." (MOO at 2013.) On March 9, 2016, an arbitrator determined that all of the claims the Court had identified as possibly subject to arbitration *were* arbitrable and, on January 25, 2017, the arbitrator granted summary judgment in favor of defendants on all of those claims. (*See* Doc. Nos. 158-08 and 158-10.)

## II. FACTUAL BACKGROUND

McGee was hired by Armstrong, on behalf of the Board, in October 2002 for the position of Director of Marketing and Public Relations; he had a one-year limited contract.[7] (Armstrong Aff ¶ 2.) Armstrong extended additional one-year contracts to McGee in 2003, 2004, and 2005 for the same position. (*Id.* ¶ 3.) In 2006, Armstrong promoted McGee to Senior Director of Marketing, Public Relations and Specialty Business, and thereafter extended one year contracts for 2006, 2007, 2008, 2009, and 2010. A contract was also extended for 2011, but McGee refused to sign it. (*Id.*)

In 2008, McGee joined the Ohio National Guard. His contract at the time (covering October 3, 2007 to October 2, 2008) provided for "military leave in accordance with Board policy." (Armstrong Aff., Ex. 1 at 2190-95 ["2007-08 Contract"], 2191.)[8] The Board policy concerning military leave, contained in the non-bargaining unit employees' handbook,[9] provided as follows:

**MILITARY LEAVE**

Non-bargaining unit employees who are members of the Ohio National Guard, Ohio Defense Corps, the Ohio Naval Militia, or other armed forces reserves are entitled to a military leave of absence from their duties without loss of pay for such time as they are in the military service, on field training, or active duty, for a period not to exceed thirty-one (31) days in any calendar year.

---

[7] County boards of developmental disabilities are governed by Ohio Rev. Code Chapter 5126. Under that chapter, a "limited contract" is "a contract of limited duration which is renewable at the discretion of the superintendent." Ohio Rev. Code § 5126.20(D). A "management employee" of such a county board "shall hold a limited contract for a period of not less than one year and not more than five years[.]" Ohio Rev. Code § 5126.21(A)(1). The employee is entitled to "notice of the superintendent's intention not to rehire the employee at least ninety days prior to the expiration of the contract." *Id.* The board must approve any term of employment that is for more than one year. *Id.* The salary of a management employee may be increased during the term of a contract, but it may not be reduced "unless the reduction is part of a uniform plan affecting all employees of the board." Ohio Rev. Code § 5126.21(A)(2). Further, "[a]ll management employees shall receive employee benefits as established by the board." Ohio Rev. Code § 5126.21(C).

[8] McGee's claims relating to his military pay, although dependent upon the various contracts between the parties, were not arbitrable because they did not relate to "removal, suspension or demotion[.]"

[9] McGee acknowledged receipt of this handbook. (*See* Kamlowsky Aff. ¶ 2 and Ex. 2.)

Employees must apply for military leave in advance by completing an Application for Leave form and submitting it, along with a copy of their orders, for approval.

The maximum number of hours for which the Agency must compensate an employee on military leave during any calendar year is one hundred and seventy-six (176) hours.

This service does not have to be for one continuous period of time.

(Kamlowsky Aff., Ex. 1 [the "Board Policy"] at 2243.) According to Armstrong, the Board Policy "essentially tracked Ohio law regarding military leave." (Armstrong Aff. ¶ 4.)[10]

When McGee joined the National Guard in 2008, he requested an increase in his military leave pay under his then-current contract. By email to Armstrong and Kamlowsky dated July 21, 2008, McGee asked to be given "as many as 10 weeks of Military Leave per calendar year during [his] current contract year [i.e., 2007-08]." (Armstrong Aff. ¶ 4 and Ex. 2 at 2227.) After discussing McGee's request with the Board Personnel Committee, Armstrong decided to retain the policy relative to 176 hours of military leave with full pay, but further decided that, for service beyond a month, McGee would be paid differential pay so that he would suffer no loss in pay due to extended military service. (*Id.*)[11] McGee's subsequent 2008-09 Contract provided for this change, as follows:

5. <u>Military Leave</u> -- The Employee shall be entitled to thirty-one (31) days of military leave. In the event the Employee is called or ordered to the uniformed services for longer than one month, Employee is entitled, during the period designated in the order, to a leave of absence and to be paid, during each monthly pay period of that leave of absence, the difference between the Employee's gross monthly salary and the sum of the Employee's gross uniformed pay and allowances received that month.

---

[10] Ohio Rev. Code § 5923.05(B) provides that an employee called to military duty for more than a month receives "the lesser of the difference between Board pay and military pay or $500.00." (Armstrong Aff. ¶ 4.) It is also notable that the statute defines "month" as "twenty-two eight-hour work days or one hundred seventy-six hours[.]" § 5923.05(B)(2)(b). Part of the problem in the instant case is the Board's inartful use of "thirty-one (31) days" instead of "month." Had the Board simply tracked the statutory language, it might have created fewer problems.

[11] In January 2009, the Board adopted the same differential benefit for all employees. (Armstrong Aff. ¶ 4.) This is a benefit greater than that provided by Ohio law since it did not include the $500.00 cap. (Kamlowsky Aff. ¶ 2.)

(Armstrong Aff. Ex. 1 at 2197;[12] *see also* Kamlowsky Aff. ¶ 2.)

In 2008, Ruth Pemberton ("Pemberton"), Payroll Supervisor for the Board (Doc. No. 163-3 ["Pemberton Aff."] ¶ 1), noticed that McGee was going to exceed 176 hours of military leave at full pay for the calendar year. (*Id.* ¶ 2.) On her own initiative, Pemberton contacted McGee to inquire whether he wanted to use vacation leave or personal leave to cover the balance of his military service.[13] McGee insisted he was entitled to 31 work days of paid military leave (or 248 hours). Before Pemberton had a chance to address this issue with her supervisor, she suffered a medical emergency and was absent from the office for awhile. (*Id.*) Later, it was revealed that, after McGee used up his 176 hours of full-pay military leave, the Board continued to pay him his full pay, not the differential pay to which he was entitled, for at least one month. (Armstrong Aff. ¶ 7; Kamlowsky Aff. ¶ 3.)

In September 2011, while McGee was on military leave, Pemberton again noticed that he was going to exceed 176 hours of military leave at full pay. She again contacted him and, again, he insisted that his contract allowed him 31 work days of military leave at full pay. (*Id.* ¶ 3.) Pemberton discussed the matter with Karen McCoy ("McCoy"), HR/Payroll Manager, and they mutually agreed to refer the issue to Lynn Sargi ("Sargi"), Director of Human Resources. (*Id.* ¶ 4.)

Sargi, in turn, discussed the issue of McGee's leave with Kamlowsky, and learned that the Board intended to pay McGee for the extra days, but also intended to insure that McGee understood that the language in his contract had been intended to mean that he was entitled to 176 hours

---

[12] McGee's 2009-10 and 2010-11 Contracts contained this exact same language. (*See* Armstrong Aff. Ex. 1 at 2204 and 2211, respectively.)

[13] The Board admits that Pemberton's inquiry was improper because, once McGee exhausted his 176 hours of military leave at full pay, he would have been entitled differential pay. (MSJ at 2169 n.5.)

without loss of pay in accordance with Ohio law, as provided to all other Board employees. (Doc. No. 163-4 ["Sargi Aff."] ¶ 3.) The Board intended to clarify the relevant provision in McGee's 2011-12 contract. (*Id.*)[14]

In August 2011, Laurie Williams ("Williams"), Human Resource Coordinator, prepared and sent a contract to McGee covering October 3, 2011 to October 2, 2012, asking him to sign and return it. He never responded. (Doc. No. 163-5 ["Williams Aff."] ¶ 2.) Then, on September 19, 2011, Williams received an email from Sargi with a revised contract for McGee to sign. (*Id.*) On October 3, 2011, when McGee had still not contacted Williams or signed his contract, she called him to come in, which he did on that same day. However, McGee refused to sign the revised contract. (*Id.* ¶¶ 3, 4.)

According to Kamlowsky, she first learned in September 2011 that, in both 2008 and 2011, the Board paid McGee "more than state law requires, more than Board policy required, and more than his employment contract required because after 176 hours was exhausted, he was paid his full pay, not the differential pay. . . . In fact, it appears that McGee was never paid differential pay until his military leave in 2012; he had always just been paid his full Board pay while on military leave." (Kamlowsky Aff. ¶¶ 3, 6.)[15] As a result, revised military leave language was incorporated into McGee's 2011-12 contract, and into *all* management contracts, because they all contained the

---

[14] Kamlowsky attests that, although she and Armstrong believed the Board should adhere to the 176-hour policy, they had also just recently learned that the Board had overpaid McGee's military pay in 2008. Rather than make him try to sort this out while he was on military leave, the Board decided to pay him the extra days and to clarify the policy in his next contract. (Kamlowsky Aff. ¶ 5.)

[15] When Kamlowsky discovered that McGee had consistently been overpaid for his military leave "based upon a misapplication of the language in his employment contract," (Kamlowsky Aff. Ex. 5 at 2263), she recommended that the language be corrected in his 2011-12 contract, but that they "honor the phrase '31 days of military leave' that exists in his current employment contract and not apply the 176 hour limitation in Ohio law." (*Id.*)

inartful "31-days" provision. (*Id.* ¶ 8.)[16] Kamlowsky explained this decision to McGee in person on October 12, 2011 and again by email on October 20, 2011. (*Id.* ¶ 9.)

Although it is not entirely clear whether McGee ever signed any contract for 2011-12, much less the 2011-12 Contract with the revised military leave language, it appears that he nonetheless continued to work for the Board. In December 2011, McGee was called to military duty and, in that context, had conversations about the manner in which the differential pay would be approved. Initially, Kamlowsky told him that the differential pay would be made in one lump sum after he returned from leave. (*Id.* ¶ 10.) This angered McGee, which Kamlowsky did not understand at the time, since she had not yet learned that he had never before been paid differential pay, as he should have been. (*Id.*) After clarification with the Board, Kamlowsky informed McGee that, if he sent his earnings statement each time he was paid by the military, the Board would calculate the difference between his gross monthly Board salary and the sum of his gross uniformed pay and allowances, and would promptly issue a check. (*Id.* ¶ 12.) Kamlowsky assured McGee that he would continue to receive differential pay, and would not be subject to the "lesser" language in Ohio Rev. Code § 5923.05. (*Id.* ¶ 13.)

On January 25, 2012, McGee emailed Kamlowsky and Armstrong his military leave and earnings statements from August and September 2011, indicating that they reflected "[his] recent two[-]week pay and show[ed] two weeks of food and housing allowances." (*Id.* ¶ 14, quoting Ex. 10 at 2282.) He also stated that his rank and years of service had not changed since these statements were issued. (*Id.*) Kamlowsky directed the Board payroll staff to pay McGee his differential pay based upon these August/September 2011 military leave and earnings statements, which occurred

---

[16] *Compare* Armstrong Aff. Ex. 1 at 2211 (¶ B.5) *with* Armstrong Aff. Ex. 1 at 2219 (¶ B.5).

beginning on February 9, 2012. (*Id.* ¶ 14.) McGee provided no additional statements until he was requested to produce them for his deposition on May 15, 2012. (*Id.*) As it turned out, his military pay for January, February, and March 2012 was more than was previously indicated by his August/September 2011 statements. (*Id.*) As a result, the Board had again overpaid McGee with respect to his differential pay. (*Id.*)

## III. DISCUSSION

### A. Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v.*

*Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992) (citation omitted). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*. (citation omitted).

**B.      McGee's Remaining Breach of Contract Claims**

In his sixth and twelfth causes of action, McGee alleges that the Board breached his contract(s) of employment by "fail[ing] to pay the required salary in the required amounts and at

the required intervals[,]" and by "fail[ing] to provide the required military leave pay and provisions as outlined in the employment agreement." (SAC ¶¶ 88, 127.)[17]

The Board argues that McGee cannot show a breach of contract because he is unable to establish that the Board failed to pay him correctly under his contract(s) and, therefore, he cannot establish damages, one of the elements of a breach of contract claim.[18] Based on the affidavits it submitted, the Board argues that, each time McGee went on military leave from 2008 through 2011, he was actually paid *more* than he was contractually entitled to, due to a misunderstanding of his contract language. When he went on leave in January 2012, he was—for the first time— properly paid under the terms of his 2011-12 Contract, a contract whose clarified terms had been explained to McGee in advance.[19]

Arguing in opposition to the MSJ, McGee disputes the Board's interpretation of his employment contract(s) and, in a conclusory fashion, declares that the Board "[has] breach[ed] the contract relating to McGee's contractually agreed upon 31 days plus additional differential of military leave benefits[,]" (Opp'n at 2344), and that "[a]t the very least . . . [there is] a genuine issue of material fact" that precludes summary judgment for the Board. (*Id.*) But McGee's 4-paragraph affidavit in support of his opposition brief contains little more than legal conclusions

---

[17] The twelfth cause of action also alleged breach of contract in the form of wrongful discharge from employment, but that matter was referred to arbitration and was resolved in the Board's favor.

[18] "In Ohio, damages are an essential element of a plaintiff's claim for breach of contract." *Anchor v. O'Toole*, 94 F.3d 1014, 1020 (6th Cir. 1996) (citing *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994)).

[19] Neither party makes anything of the fact that the 2011-12 Contract was apparently never executed by anyone. That said, each of McGee's one-year limited contracts contained a provision that the contract would "renew automatically for successive one-year periods unless the Superintendent notifies the employee in writing no later than 90 days prior to the expiration of the contract." (*See, e.g.*, Armstrong Aff. Ex. 1 at 2194 ¶ IX.)

regarding his view of the proper construction of his employment contract(s). Such conclusions are the province of the Court and are outside the scope of a proper Rule 56(c)(4) affidavit.[20]

Although the Board argues that it mistakenly overpaid McGee when he took military leave under the contracts between 2007-08 and 2010-11 (by paying him in full for 31 days),[21] and although McGee challenges the Board's interpretation of those contracts, in his opposition brief McGee concedes that "[d]uring [his] leave in 2008 and 2011, the Board paid [him] for 31 days of military leave -- as they were contractually obligated to do." (Opp'n at 2338.) Therefore, even if the Court adopts McGee's interpretation of all of these earlier contracts (*i.e.*, that they entitle him to 31 days military leave at full pay),[22] he cannot establish a breach because, by his own admission, that *is* what he was paid.

The only contract actually remaining at issue in the case is the 2011-12 Contract. The unrefuted record establishes that there were two versions of the 2011-12 Contract, each providing

---

[20] As properly pointed out by the Board in its reply, McGee is also attempting, by way of his opposition brief, to assert an entirely new, unpleaded claim that the Board breached his contract by failing to pay him vacation leave, sick leave, personal leave, and professional leave upon his termination, and by not paying the employer contributions toward his retirement account. (Reply at 2369; *see also* Opp'n at 2344 and Doc. No. 165-1 ["McGee Aff."] ¶ 3.) To the extent paragraphs 3 and 4 of McGee's affidavit contains factual material, there is absolutely *no* evidentiary support in the record for those "facts." McGee is not permitted to *create* a factual dispute by simply declaring something to be factually true. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) (general averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes). Nor will McGee be permitted to "amend" the SAC by way of arguments in a brief. *See D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 1001-02 (6th Cir. 2005) (citing cases affirming various district courts' denials of leave to amend where the request was made in a brief rather than in a motion for leave to amend).

[21] The Board has made no attempt to recoup the overpayments. Under *Ebert v. Stark Cty. Bd. of MRDD*, 406 N.E.2d 1098 (Ohio 1980), the Board has the authority to provide compensation and/or benefits in excess of statutory minimums. *Id.* at 1100 ("In order for the power to employ [personnel] to have any significance, it must, of necessity, include the power to fix the compensation of such employees.).

[22] In his opposition brief, McGee asserts: "While the Board claims their intent was to provide the benefits described in R.C. 5923.05, that does not not change the plain meaning of the contract that they repeatedly agreed to with Kevin McGee." (Opp'n at 2342.) Since McGee has conceded that he was paid for 31 days of military leave under all of the earlier contracts (*i.e.*, the contracts before 2011-12), there is no need to determine whether he was entitled to it or not under the "plain meaning" of the various contracts prior to his final contract.

different language for the military leave provision, and neither of which was ever signed by McGee (or, for that matter, by the Board).[23]

The 2011-12 Contract originally presented to McGee, by email dated August 26, 2011, provided for "thirty-one (31) days of military leave[,]" followed by differential pay, if leave extended beyond that period. (Williams Aff. Ex. 1.) This was the same language that was in most of McGee's earlier contracts. This is also the version of the contract that McGee references in and attaches to his opposition brief. (*See* Doc. No. 165-3.)

After it was discovered in September 2011 (while McGee was on military leave) that he had been being overpaid under the leave policy, his proposed 2011-12 Contract was modified to clarify the Board's intent that "[t]he Employee shall be entitled to military leave in accordance with Ohio law." (Armstrong Aff. Ex. 1 at 2219, quoting ¶ B.5. of the second proposed version of the 2011-12 Contract.)

As already noted, Ohio Rev. Code § 5923.05(A) provides, in relevant part, that public employees are entitled to military leave "for periods up to one month," with "month" defined as "twenty-two eight-hour work days or one hundred seventy-six hours[.]" It further provides that, for military leave "longer than a month," the public employee is to be paid "the lesser of" their differential pay or $500.00.

By email dated October 20, 2011, and copied to Armstrong, Kamlowsky sent this modified 2011-12 Contract to McGee. (Kamlowsky Aff. ¶ 7 and Ex. 4.) In her email, Kamlowsky stated that the contract "does not reflect changes in the terms and conditions of your employment as you

---

[23] The change in the language between the first proposed 2011-12 contract and the final proposed 2011-12 contract is best shown by Kamlowsky Aff. Ex. 5B at 2434.

enjoy them today or through the term of your previous (and now expired) employment contract."

(*Id.* at 2254.) She further explained:

> There are two sections however where language has been changed in this contract from your previous contract. The first is the title of the position for which you are employed. It has been changed from "Director of Public and Community Relations and Specialty Business" to "Director of Public and Community Relations" to accurately reflect your current duties and responsibilities which no longer include supervision of the specialty businesses. The second area is under the heading of military leave. This language has been revised from its form in your previous contract to accurately reflect that the Board is responsible to administer military leave to you and all of its employees in accordance with Ohio Revised Code Section 5923.05 and consistent with Board policy. As you were correctly advised by the payroll department, the Board applies one month's leave consistent with the definition in Ohio law and Ohio Attorney General Opinions to mean 176 paid hours within a calendar year. This will provide you with the maximum amount of military leave allowed under Ohio law and due to the Board's policy adopted in 2009, upon exhaustion of that one month's leave, payment to you in the sum of the difference of your gross wages at the Board and your military wages in particular circumstances where you may be called to active duty.
>
> If for whatever reason you choose not to sign this contract, by operation of law your expired contract remains in effect through 10/2/12. Your title and the administration of military leave will be implemented as outlined in your contract and this email through 10/2/12. Please let me know if you have any questions. Thanks[.]

(*Id.*)

Although earlier contracts were arguably unclear regarding the number of days or hours for which McGee was entitled to full-pay military leave, the Board was free to clarify its intent in the 2011-12 Contract. In McGee's opposition brief, without a pinpoint record citation, he insists that the 2011-12 Contract continued to provide 31 days of military leave at full pay. (*See* Opp'n at 2342-43 ("In 2012, [d]efendants refused to compensate [p]laintiff for the 31 days of military leave of which [sic] he was entitled.") (citations omitted).) But this is not so; the revised 2011-12 Contract stated that military leave was "in accordance with Ohio law." In addition, Kamlowsky's

email made clear that his job title and the administration of his military leave as set forth in the revised 2011-12 Contract would be implemented whether or not McGee signed the contract.

Although McGee might have preferred that the Board continue to pay him in accordance with the earlier amounts and methods (which the Board asserts were mistakes even at the time they were made), he points to no legal authority that would contractually require the Board to do so. The Board's unrefuted submissions show that Ohio law allowed a military leave of absence of 176 hours at full pay, followed by differential pay (based on timely documentation provided by the serviceman or woman). In fact, the Board has shown that McGee's differential pay was actually not limited to $500.00, as would have been required by Ohio law.

Therefore, the Board did not breach the 2011-12 Contract with respect to McGee's military leave pay under that contract.[24]

---

[24] As a final matter, the Court notes that, in addition to challenging the amounts of military leave pay that he received, McGee's complaint also asserts that the Board failed to pay "at the required intervals[.]" (SAC ¶¶ 88a, 127a.) Although the Board gives limited attention to this assertion in its motion, it does present evidence that the payments were made as soon as McGee provided documentation of his military pay and benefits (as required by Ohio law), so that the differential pay could be computed. As a public agency, the Board had a fiduciary obligation to the public to require appropriate documentaion prior to payment and, if the payments were tardy, it can only be attributed to McGee's failure to timely supply the requisite (and accurate) documentation.

## IV. CONCLUSION

For the reasons set forth herein, plaintiff Kevin McGee has failed to establish any breach of contract with respect to his military leave pay and, therefore, the motion for summary judgment filed by defendants Thomas Armstrong, Lisa Kamlowsky, and the Summit County Board of Developmental Disabilities (Doc. No. 163) is granted.[25] This ruling resolves what remained in the case following arbitration and, therefore, the case will be dismissed by separate order.

**IT IS SO ORDERED**.

Dated: August 16, 2018

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[25] Because no breach has been established, the Court need not consider whether, had there been a breach, McGee would be entitled to claim "liquidated, compensatory, punitive, exemplary damages, as well as attorney's fees, costs, and other equitable relief." (Opp'n at 2340.)